Estate of Herbert G. Larsh, Deceased, Wells Fargo Bank & Union Trust Co., Executor v. Commissioner.
Estate of Herbert G. Larsh, Deceased v. Commissioner
Docket No. 19763.
United States Tax Court
1949 Tax Ct. Memo LEXIS 86; 8 T.C.M. (CCH) 799; T.C.M. (RIA) 49221; August 31, 1949
Robert C. Harris, Esq., for the petitioner. T. M. Mather, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: The Commissioner determined a deficiency in estate tax in the amount of $29,610.15. The questions involved in passing upon the correctness of the determination are: (1) Whether insurance proceeds to the extent of $49,558.45 are to be excluded from the taxable estate on the ground that such proceeds represented the separate property of Florence Larsh, decedent's widow. (2) Whether an undivided interest of 422.5/2103 in all of the property of the decedent and his wife previously held as community property, was transferred on December 29, 1942, in contemplation of death and accordingly is *87 includible in the taxable estate. Findings of Fact All facts herein were stipulated and are adopted as stipulated. Herbert C. Larsh died in San Francisco, California, on June 17, 1944. His will, dated October 23, 1931, and two codicils thereto, dated respectively April 7, 1939, and July 25, 1942, were duly admitted to probate by the Superior Court of the State of California in and for the city and county of San Francisco. Wells Fargo Bank & Union Trust Co., was the duly appointed, qualified, and, up to the date of the hearing herein, was the acting executor under the will of said decedent. Decedent for many years prior to his death had been employed by Wells Fargo Bank & Union Trust Co. and until approximately six months prior to his death was active in business and was the vice president of said bank in charge of its real estate department. He died as the result of a brain tumor at the age of 66 years. On or about the 24th day of December, 1932, an agreement of trust was executed by and between decedent as trustor, Florence Larsh, trustor's wife, and Wells Fargo Bank and Union Trust Co. as trustee wherein and whereby certain insurance policies on the life of decedent were *88 transferred to the trustee for the purpose of creating an insurance trust. In said agreement, among other provisions, the trustee was directed "to pay the entire net income, revenue and profit of the trust estate, to the trustor so long as he shall live, and from and after the death of the trustor the trustee shall pay one-half of the net income, revenue and profit of the trust estate to Florence Larsh, wife of the trustor." The agreement then provided for the payment of the remaining half of the income to decedent's two daughters and additional provisions were then made as to distribution after the death of the immediate beneficiaries. It was also provided in said agreement: "1. The Trustee shall not be obligated to pay any premiums or assessments or make any other payments on said policies, and the Trustee shall have no obligation in respect to the said policies or any other property held under the terms of this agreement except to the extent expressly agreed to herein. * * *
"7. The Trustor shall have the power at any time during his lifetime by an instrument in writing delivered to the Trustee to modify, alter, or terminate this agreement in whole or in part and to withdraw *89 any policies, or to surrender the same for the surrender value thereof, or for other policies or other insurance, or to borrow money thereon, provided however, that, except as to revocation of this agreement or the withdrawal or surrender of policies or the borrowing of money thereon, the duties, powers and liabilities of the Trustee hereunder shall not be substantially changed without the written consent of the Trustee." At the time of the agreement the trust estate contained life insurance policies of the aggregate principal amount of $93,028.20 and accident insurance policies of the aggregate principal amount of $35,000. Florence Larsh, in executing said agreement, agreed to be bound thereby "notwithstanding that any of the premiums of any of the insurance policies held hereunder may have been paid from the community property of the marriage of the Trustor and the wife of the Trustor, or from the separate property of the Wife of the Trustor, and notwithstanding that any other property held hereunder may be community property of the marriage of the Trustor and the Wife of the Trustor, or the separate property of the Wife of the Trustor." On December 31, 1941, decedent and his *90 wife entered into an agreement in which it was stated that the parties were "owners of certain personal and real property hereinafter described;" that it was "the desire of the parties to identify, fix and determine their interest in all property acquired by them;" as "hereinafter described"; "An undivided 601/2103 thereof was the separate property of Florence Larsh; "An undivided 657/2103 thereof was community property of a type and kind acquired prior to July 29, 1927; and "An undivided 845/2103 thereof was community property of a type and kind acquired subsequent to July 29, 1937." In said agreement the property referred to as "hereinafter described" was not described, but attached to the agreement was a statement of the value of the interests of the parties to the agreement in the property which had been acquired since their marriage. As of December 31, 1919, it was agreed that the valuation of their jointly held property was as follows: Total property jointly held
$33,020.05
Property acquired by wife by inheri-
tance
27,263.39
Community net worth as of Dec. 31,
1919
$ 5,756.66
As of December 31, 1927, the agreed property holdings were as follows: *91 Total net worth of Herbert C. Larsh and Florence Larsh
$101,055.46
Florence Larsh separate property
$27,263.39
Add: Average earnings on same at 5 per cent for six years
8,079.01
Net value Florence Larsh separate property
35,342.40
Community net worth
$ 65,713.06
The property owned December 31, 1941, after computing 5 per cent interest on Florence Larsh's share for an additional 14 years, was as follows: Florence Larsh separate property
$ 60,082.08
Community property 1904-1927
65,713.06
Community property 1927-1941
84,580.84
$210,375.98
On December 29, 1942, decedent and his wife entered into another agreement. By said agreement the community property of a type and kind acquired subsequent to July 29, 1927 (as determined by their previous agreement to have constituted 845/2103ths of their property) was divided by the parties thereto into equal undivided portions, each undivided portion to be considered the separate property of the holder thereof. In May 1946, in a proceeding in the Superior Court of California for the city and county of San Francisco entitled "Florence Larsh, Plaintiff, against Wells Fargo Bank & Union *92 Trust Co., as Executor, Defendant," a decree was made quieting the title of Florence Larsh in and to certain real and personal property described in said decree in accordance with the provisions of said aforementioned agreement. In that proceeding plaintiff sought the quieting of title only in that property which was listed on a memorandum in the handwriting of Herbert Larsh and dated "as of December 31, 1942." That memorandum listed certain investments and savings as constituting Florence Larsh's separate property and as being a 601/2103 part of said estate. Another division consisted of community property acquired before July 29, 1927, (a 657/2103 part of said estate). This tabulation consisted of real estate, accounts receivable, money in bank and incidentals. The third division consisted of property listed as community property acquired after July 29, 1927, (a 845/2103 part of said estate) and consisted of certain investments. No insurance policies were referred to in said memorandum. A tabulation of the value of these three divisions in the memorandum is as follows: Florence Larsh separate property
$ 62,804.44
Community property 1904 to 1927
67,859.60
Community property 1927 to 1942
89,023.01
Total
$219,687.05
*93 The Court accepted the aforesaid memorandum which was introduced in evidence and entered its judgment quieting title to the specific property set forth in said memorandum according to its terms. Decedent was a secretive man who did not disclose his private affairs to his associates. Although the text of both agreements between decedent and his wife was prepared by counsel, at no time did decedent disclose to such counsel the specific nature, character or amount of the property involved. One Harold G. King, who was employed in the tax department of Wells Fargo Bank and Union Trust Co. often discussed with decedent matters relating to income taxes. King advised decedent that it would be advisable to have the types of ownership of the property held by decedent and his wife determined by agreement and the decedent stated that he would follow this advice. During 1942 King became aware of proposed legislative changes regarding income taxes which might require community property to be reported without division between husband and wife and because of the proposed legislative changes, made recommendations to many of the officers of the bank that it would be advisable from all tax standpoints *94 to segregate community property into separate property. The decedent was one of the officers to whom King made this recommendation. At the time decedent entered into the agreements of 1941 and 1942 he was in good health and had no knowledge of the brain tumor which caused his death. The will of decedent dated October 23, 1931, expressed an intention to dispose of all the community property of decedent and his wife and contained elaborate trust provisions under which decedent's wife was to receive one-half of the net income from the entire estate and decedent's daughters were to receive the remaining one-half. The first codicil dated April 7, 1939, changed this division of income to provide that the wife should receive two-thirds thereof and the daughters one-third. The second codicil dated July 25, 1942, was holographic and decedent therein stated that he desired his interest in a parcel of real property known as "The Duck Club" to be given to a friend subject to the approval of his wife and reserving all oil and gas rights. Decedent was 64 years old in 1942 with a life expectancy according to "The Actuaries or Combined Experience Table" of 11.51 years. For many years prior to *95 his death he was actively interested in duck shooting. In 1935 he owned a one-third interest in certain duck hunting property. In 1937 he acquired an additional one-fourth interest, all of which he held at the time of his death. During the year of his death he operated a tractor for three days and by other means worked to improve the physical character of the duck hunting property and he participated in shooting thereon. He played golf until the time of his last illness. In 1936 he acquired a residential site and in 1940 built thereon a residence costing approximately $40,000. Petitioner, by reason of this appeal, has incurred attorneys' fees in an amount not now known, but will pay said fees when the amount thereof is known, which payment will represent an additional deduction from the gross estate. If petitioner does not prevail in this proceeding, there will be owing the State of California additional inheritance taxes which petitioner will pay and claim credit therefor. In his determination of deficiency pertaining to the inclusion of amounts recovered on insurance policies following the death of Herbert Larsh respondent says: "There is added to the gross estate insurance *96 proceeds in the amount of $49,558.45. In the estate tax return you showed insurance proceeds in the amount of $101,828.47, and you reported only $52,270.02 as the value of the decedent's interest therein. The entire value of all of the insurance is includible in the gross estate because all incidents of ownership in and to all of the policies of insurance as shown in the return were possessed by decedent at his death, and further because such insurance was purchased with premiums paid by decedent within the meaning of section 811 (g) (2) of the Internal Revenue Code." As to the 422.5/2103 interest in the property acquired after 1927, the respondent states in his determination: "There is further added to the gross estate the undivided interest of 422 1/2/2103 in all other properties owned by decedent and his wife, Florence Larsh, at the date of death, having aggregate net value of $289,062.19 of which the undivided interest of 422 1/2/2103 amounts to $58,073.61. Said interest in such property became the separate property of decedent's wife pursuant to an agreement dated December 29, 1942, effecting a division of community property between the decedent and *97 his spouse. As the transfer took place within a period of two years prior to decedent's death and as it has not been shown that a transfer did not constitute a transfer in contemplation of death, the property so transferred is includible in decedent's gross estate." The entire amount of the proceeds of the insurance policies on decedent's life, being $101,828.47, is a part of decedent's estate for estate tax purposes. The undivided interest in the community property acquired after 1927 and conveyed to decedent's wife in December 1942 was not conveyed by decedent in contemplation of death. Opinion Under the insurance trust agreement in evidence, decedent trustor reserved to himself the income, revenue and profit from the trust during his life; the right to withdraw or pledge the trust corpus; and the right to amend or revoke the trust contract itself, subject only to the limitation that such acts, if affecting the duties, powers and liabilities of the trustee, must have the consent of the trustee. Obviously the trust agreement did not materially affect the property status or the taxability of the insurance. The insurance policies themselves were, to all effects and purposes, under *98 the control of the decedent up to the time of his death. Furthermore, under the trust agreement not only was the trustee relieved from all obligation to pay the insurance premiums but there was no source of revenue provided from which the trustee could make such payments. The trustor's wife agreed to be bound by the agreement even though the premiums were paid from community funds. Our only conclusion, therefore, is that said premiums must have been paid from decedent's earnings which constituted community property as soon as received. From a statement in the estate tax return it would appear that the trust agreement may have been amended prior to the trustor's death but such amendments, if material, are not in evidence. The only remaining question is the one raised by the contention of the petitioner that when the property division agreement of 1941 stated that it was the purpose of decedent and his wife to "determine their interest in all property acquired by them", the insurance policies were included in the property so divided. The chief difficulty with this contention is that the term "all property" was limited at least three times in the agreement to such property as was *99 "herein described" or "hereinafter described." Since there was no description of property included in the agreement or attached thereto, it becomes necessary for us to determine what property the parties to the agreement referred to by the limitation. The agreement fixes the respective ratio of the three classifications of property therein provided as being 601/2103, 657/2103 and 845/2103 of all the property referred to in the agreement. Subsequently petitioner's decedent, in his own handwriting, prepared a memorandum of the property held by himself and his wife as of December 31, 1942. In this memorandum he listed all property, including savings, bank deposits, accounts receivable, stocks, bonds, automobiles and real estate, but excluded all mention of any rights or interests in insurance policies. The total value of all the property listed in the memorandum was $9,300 more than the total valuation of property which was attached to the agreement of December 31, 1941. The respective ratios of the three classifications were the same in the memorandum and in the agreement. Obviously, if the decedent had intended to include his interest in the insurance policies in the memorandum, surely *100 some reference to the policies would have been made and if the policies were included in the totals attached to the agreement of December 31, 1941, the respective ratios of the agreement and the memorandum would have been different and the total value of the property covered by the agreement would certainly have been considerably greater than that given in the subsequent memorandum which contained no value for any insurance policies. We conclude that under the provisions of section 811 (c) and (g) (2), I.R.C., the amounts received by the trustee of the insurance trust are all taxable to the petitioner. Respondent's second contention, however, that the transfer of property from decedent to his wife effected by the agreement of December 31, 1942, was in contemplation of death, in our opinion, is not supported by the facts. Petitioner does not dispute that the transfer of community property to the individual ownership of decedent's wife constituted a gift; that such gift was made within two years of the donor's death; that it was final between the parties; that its subject matter was a material part of the donor's property; and that it was without consideration. *101 Therefore under section 811 (c), I.R.C., the presumption is that such gift was made in contemplation of death. However, in our opinion, the stipulated facts in this case overcome such presumption and support an affirmative conclusion that the gift of 1942 was not made in contemplation of death. The stipulated facts herein contain a statement that: "During the consideration by Congress of the Revenue Bill of 1941, a proposal was made in each House to tax the income from community property in such a manner as to destroy some of the income tax advantages then existing in community property states. The House provision was passed by the House but rejected by the Senate. The Senate provision was rejected in committee." We have not quoted that statement in our findings of fact because there was nothing in the record to indicate that petitioner's decedent had knowledge of such legislative attempts except such inference as one might gather from the nature of decedent's employment and the fact that at the end of 1941 he made the agreement referred to in the findings. The stipulation directs our attention to the fact that it was income tax that was primarily in *102 the mind of Congress in framing the new law and if any inference is to be drawn, it would be that petitioner's decedent was motivated to make the 1941 agreement with his wife from considerations of income tax. When one is disturbed about income tax, he is thinking about living and earning income. In 1942, however, the stipulation expressly provides that one Harold G. King conferred with decedent on the effect of the proposed revenue act of 1942 on income tax problems in community property states and that said King advised decedent to have the types of ownership of the property held by him and his wife determined by agreement. At that time the said King was familiar with the proposed legislative changes to equalize taxation in community property states and non-community property states and he advised the officers of the bank, including petitioner's decedent, that from all tax standpoints segregation of community property was advisable. The final illness of decedent was a brain tumor from which he suffered for six months prior to his death. He held his position as vice president of the bank in charge of its real estate department up until his last illness. During the year of his *103 death and prior to his illness he personally operated a tractor for three days at a duck hunting location in which he was the owner of a one-half interest and otherwise worked to improve the conditions at this duck club. During the year he participated in shooting at the duck club, he played golf at the Praesidio Club in San Francisco until the time of his last illness. In 1940 he invested $40,000 in a home for himself and his wife. At the time of the agreement in 1942 he was 64 years of age with a reasonable expectancy of 11.51 years of life. In addition to the above, the very fact that petitioner neglected to make provision in his 1942 property arrangement with his wife for his insurance, which, of course, would mature at his death, indicates that at that time he was thinking of matters of life and future income taxes rather than death and estate taxes. It would have been a comparatively easy matter for the decedent, had he been in contemplation of death in December 1942, to have arranged for the division of his interest in the insurance policies, if the tax welfare of his estate had been primarily in his mind at that time. From all of the above we conclude that the gifts which decedent *104 made to his wife in December 1942 were not made in contemplation of death. The parties have stipulated that the prosecution of this litigation will entail additional attorneys' fees of an undetermined amount and that if the petitioner is not successful throughout in this case, additional taxes will be due the State of California. Both of these items may be included in the final computation under Rule 50 and an order will be made at that time. Decision will be entered under Rule 50.